**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

HEATHER FLYNN,

     Plaintiff,

v.                                    Case No:  6:16-cv-87-Orl-40TBS

FIDELITY NATIONAL MANAGEMENT
SERVICES, LLC,

     Defendant.

_____

## ORDER

     This cause comes before the Court on Defendant Fidelity National Management Services, LLC's Motion for Summary Judgment and Memorandum of Law in Support Thereof (Doc. 23), filed February 1, 2017.  The parties have completed their briefing and the Court is otherwise fully advised on the premises. Upon consideration and review of the record, including all pleadings, deposition transcripts, affidavits, exhibits, and the parties' respective legal memoranda, the Court will deny Defendant's Motion for Summary Judgment.

## I.    BACKGROUND

     Plaintiff, Heather Flynn ("Flynn"), began working for Defendant, Fidelity National Management Services, LLC ("Fidelity"), in November 1998.  During the time period at issue in this case, Flynn held a position in Agency Client Services.  (Flynn Aff. ¶ 10).  On August 28, 2013, Flynn filed a request with Fidelity for intermittent leave pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654, due to her own serious health condition.  (Flynn Dep. Ex. 37).  Although there were initial issues with Flynn's supporting paperwork, Fidelity ultimately granted Flynn's request on October 28, 2013,

and retroactively approved Flynn to take intermittent FMLA leave between August 26, 2013 and February 24, 2014.  (Flynn Dep. 131:10–25, 133:13–136:5; Sealed Doc. 34-3).

Beginning near Flynn's period of intermittent FMLA leave, Fidelity asserts that Flynn's performance at work began to suffer.  (Dunleavy Aff. ¶ 20).  Consequently, Fidelity moved Flynn from her position in Agency Client Services to a position as an Agency Sales Assistant.[1]  Despite her transition to Agency Sales Assistant, however, Fidelity says that Flynn's work performance continued to deteriorate.  Fidelity states that Flynn violated a number of company policies, including wearing unprofessional attire at work, using her company email for personal business, allowing her daughter to use her company-issued laptop, failing to communicate and adhere to an appropriate work schedule, and failing to complete tasks in a satisfactory and timely manner.  (*Id.* ¶¶ 21–26).  According to Fidelity, Flynn was also the subject of numerous complaints.  (*Id.* ¶ 22).

As a result, on November 21, 2013, one of Flynn's supervisors, Jason Somers, and Fidelity's human resources representative, Becky Adair, met with Flynn to discuss her shortcomings and to express Fidelity's expectations of Flynn moving forward.  (Flynn Dep. 112:3–113:25, 115:4–9).  Notwithstanding, Fidelity issued a Notice of Performance Counseling to Flynn on December 13, 2013, citing that Flynn had again violated certain company policies.  (Doc. 31-5).  In the Notice of Performance Counseling, Fidelity informed Flynn that a follow-up review would be conducted on January 3, 2014, and warned that "failure to improve by this date may result in further disciplinary action up to and including demotion, and/or termination."  (*Id.*).

---

[1]   The parties characterize Flynn's change in position differently.  Fidelity claims that it offered Flynn the position of Agency Sales Assistant, which Flynn accepted. (Dunleavy Aff. ¶ 22).  Flynn says she was demoted.  (Flynn Aff. ¶ 13).

Around the same time, in late November and early December 2013, Flynn began emailing Ms. Adair and another of her supervisors at Fidelity, Mary Pat Dunleavy, to request that she be allowed to switch from intermittent to continuous FMLA leave in order to address her worsening health condition. (Flynn Aff. ¶ 15). However, Flynn states that Ms. Adair and Ms. Dunleavy ignored her requests. (Flynn Aff. ¶¶ 15, 17). Flynn asked Ms. Adair about switching to continuous FMLA leave again on January 21 and 22, 2014. (Dunleavy Aff. Ex. 3). Ms. Adair responded that she would look into what options were available and would set up a time for Flynn to meet with her and Mr. Somers to discuss the situation. (*Id.*). Fidelity terminated Flynn five days later. (Doc. 31-6).

On January 20, 2016, Flynn initiated this lawsuit against Fidelity to vindicate her rights under the FMLA. Flynn accuses Fidelity of interfering with and retaliating against her exercise of FMLA leave. Fidelity now moves for summary judgment

## II.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials," but may also consider any other material in the record. Fed. R. Civ. P. 56(c)(3).

A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact

is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must go beyond the pleadings and "identify affirmative evidence" which creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). In determining whether a genuine dispute of material fact exists, the court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## III.  DISCUSSION

Under the FMLA, eligible employees are entitled to twelve workweeks of leave during any twelve-month period to address or care for certain enumerated family- and healthcare-related needs. *See* 29 U.S.C. § 2612(a)(1). Relevant to the parties' dispute

here, an eligible employee is entitled to such leave in order to care for "a serious health condition that makes the employee unable to perform [her job-related functions]." *Id.* § 2612(a)(1)(D). Subject to certain limitations not applicable to this case, the employee may take her leave continuously or may take intermittent leave as her serious health condition permits. *See id.* § 2612(b)(1). It is illegal for an employer to interfere with or retaliate against an employee who exercises or attempts to exercise her rights under the FMLA. *Id.* § 2615(a)(1). An employer who violates an employee's FMLA rights is liable to the employee for damages, including a potential award of liquidated damages, and equitable relief. *See id.* § 2617(a)(1).

Fidelity moves for summary judgment on the ground that Flynn cannot prove her FMLA interference and retaliation claims as a matter of law. The Court examines Flynn's claims in turn.

### A.    Retaliation Claim

Flynn asserts that Fidelity retaliated against her by demoting her from the Agency Client Services position to Agency Sales Assistant in November 2013, issuing her a Notice of Performance Counseling in December 2013, and terminating her in January 2014. Flynn alleges that Fidelity carried out these retaliatory acts due to her exercise of intermittent leave and attempted exercise of continuous leave under the FMLA.

Because Flynn relies on indirect evidence to support her allegations, she must satisfy the *McDonnell Douglas* burden-shifting framework to prove her FMLA retaliation claim. *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000). To do so, Flynn "must first establish a prima facie case of retaliation by showing (1) that [s]he engaged in statutorily protected activity, (2) that [s]he experienced an adverse

employment action, and (3) that there is a causal connection between the protected activity and the adverse employment action." *Bartels v. S. Motors of Savannah, Inc.*, No. 16-11958, 2017 WL 894452, at \*2 (11th Cir. Mar. 7, 2017) (per curiam).  If Flynn establishes a prima facie case, the burden of production then shifts to Fidelity to articulate a legitimate, non-retaliatory reason for taking adverse action against Flynn.  *Id.*  Should Fidelity do so, Flynn is left with the ultimate burden of persuading the jury by a preponderance of the evidence that Fidelity's proffered non-retaliatory reason is not the true reason for its conduct, but rather a pretext for Fidelity to illegally retaliate against Flynn.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–08 (1993).

Fidelity contends that Flynn's retaliation claim fails because she can neither establish a prima facie case of retaliation nor prove that Fidelity's legitimate, non-retaliatory reason for taking adverse action against Flynn is a pretext for retaliation.

### 1.    Flynn's Prima Facie Case

Fidelity does not dispute that Flynn engaged in statutorily protected activity when she requested and took intermittent leave beginning in late August 2013.  Fidelity also does not dispute that its decision to terminate Flynn constitutes an adverse employment action.  Instead, Fidelity contests Flynn's ability to establish a prima facie case for three reasons.  First, Fidelity submits that Flynn did not engage in statutorily protected activity when she inquired about switching from intermittent to continuous leave.  Second, Fidelity asserts that its decision to move Flynn from her position in Agency Client Services to a position as an Agency Sales Assistant does not amount to an adverse employment action.  And third, Fidelity maintains that Flynn cannot establish the requisite causal

connection between her statutorily protected activities and any adverse employment action.

On Fidelity's first argument, Flynn engaged in statutorily protected activity when she requested permission to switch to continuous leave.   It is not necessary for an employee to be currently eligible for the FMLA leave she seeks to be engaged in protected activity under the FMLA.   *Pereda v. Brookdale Senior Living Cmtys., Inc.*, 666 F.3d 1269, 1276 (11th Cir. 2012).   Indeed, pre-eligibility discussions concerning potentially qualifying FMLA leave are protected by the statute.   *Id.*   And it is not necessary for the employee to expressly reference the FMLA in the discussions with her employer.   *Cruz v. Publix Super Mkts., Inc.*, 428 F.3d 1379, 1383 (11th Cir. 2005).   So long as the employee conveys sufficient information to place the employer on notice that she needs FMLA leave for a qualifying reason, the employee has engaged in protected activity.   *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1436 (11th Cir. 1997); *see also Cruz*, 428 F.3d at 1383–85 (examining several cases discussing the amount and type of information necessary to place an employer on notice).

Flynn states that she began requesting the switch from intermittent to continuous leave in late November and early December 2013.   (Flynn Aff. ¶ 15).   Flynn says that she emailed her supervisor, Ms. Dunleavy, and Fidelity's human resources representative, Ms. Adair, "several times, each time requesting continuous FMLA leave as a result of [her] chronic medical conditions of depression, anxiety and panic attacks."   (*Id.*).   Flynn also emailed Ms. Adair on January 21 and 22, 2014, again seeking information regarding her need for continuous leave.   (Dunleavy Aff. Ex. 3).   In these latter emails, although Flynn did not directly reference continuous leave, she did cite the FMLA and confirmed

that she was "suggesting a leave that is not intermittent like [she was] currently on." (*Id.*). Further, Fidelity already knew that Flynn was suffering from an FMLA-qualifying serious health condition, as Fidelity had recently approved Flynn to take ongoing intermittent leave under the FMLA due to her depression, anxiety, and panic attacks. (Sealed Docs. 34-1, 34-2, 34-3). As a result, Fidelity was also already in possession of medical information attesting to Flynn's health issues. (*Id.*). Fidelity was consequently well-apprised of Flynn's health situation and had adequate notice to know that Flynn was attempting to invoke her rights under the FMLA for a potentially qualifying reason when she emailed Ms. Dunleavy and Ms. Adair in November and December 2013 and again on January 21 and 22, 2014. Flynn's emails discussing her need for a non-intermittent type of leave due to her serious health condition are therefore protected activities under the FMLA.

Fidelity's uncertainty about whether Flynn would ultimately qualify for continuous leave does not change the result. Once Fidelity received Flynn's requests for continuous leave, it was incumbent on Fidelity to either determine Flynn's eligibility or to gather more information from Flynn in order to aid in that determination. *See Cruz*, 428 F.3d at 1383. However, according to Flynn, Fidelity did neither and instead ignored her requests or delayed a determination until a later time. (*See* Flynn Aff. ¶¶ 15, 17; Dunleavy Aff. Ex. 3). Whether Flynn was in fact eligible for continuous leave at the time she made her requests is consequently not fatal to her prima facie case given these circumstances. *See Pereda*, 666 F.3d at 1276.

On Fidelity's second argument, Flynn suffered an adverse employment action when Fidelity moved her to the Agency Sales Assistant position. The Eleventh Circuit

has identified two categories of adverse employment actions.  Intuitively, the first category consists of those "ultimate employment decision[s]" where the employer fires, demotes, or decides not to hire or promote an employee.  *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).  The second category consists of other actions taken by the employer— short of an ultimate employment decision—which result in "a serious and material change in the terms, conditions, or privileges of [the employee's] employment."  *Id.* at 970–71 (quoting *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001)) (emphasis omitted).  This second category of adverse employment action typically involves materially unfavorable changes to the employee's compensation, status, perquisites, work schedule, or advancement opportunities.[2]  *See id.* at 970.

In this case, Fidelity's decision to move Flynn from her position in Agency Client Services to a position as an Agency Sales Assistant falls within the second category of adverse employment actions.  As the parties both explain, the change in position also came with a change in Flynn's compensation structure.  Instead of the fixed salary of $50,000 per year and the guaranteed commissions Flynn received in the Agency Client Services position, she earned an hourly wage in her new position (which resulted in a lower total annual income)[3] with no guaranteed commissions or bonuses.  (Flynn Aff.

---

[2]   The Court notes that, although not at issue in the instant case, the effect of an employer's adverse action against an employee need not be employment- or workplace-related to be actionable.  *See Crawford v. Carroll*, 529 F.3d 961, 973–74 (11th Cir. 2008) (citing and discussing the U.S. Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)).

[3]   While Fidelity claims that Flynn's hourly wage would essentially equal the $50,000 salary she received in her previous position if she worked forty hours per week, Flynn illuminates that she always worked less than forty hours per week in her new position; as a result, Flynn was unable to earn the wage equivalent of her prior salary.  (Flynn Aff. ¶ 13).

¶¶ 11, 13; Dunleavy Aff. ¶ 22).  This unfavorable change in Flynn's compensation structure clearly constitutes a serious and material change in the terms of her employment, thus amounting to an adverse employment action.

Fidelity's issuance of the Notice of Performance Counseling on December 13, 2013 also falls within the second category of adverse employment actions.  In the Notice of Performance Counseling, Fidelity admonished Flynn for violating several company policies and warned her that "failure to improve . . . may result in further disciplinary action up to and including demotion, and/or termination."  (Doc. 31-5).  The Notice of Performance Counseling therefore served to unfavorably change Flynn's status as an employee, disciplining her and notifying her that she was subject to termination.  This unfavorable change in Flynn's status therefore constitutes an adverse employment action as well.

On Fidelity's third argument, the Court finds that Flynn produces sufficient evidence indicating a causal connection between her protected activities and Fidelity's adverse employment actions.  To establish causation, an employee "need only show 'that the protected activity and the adverse action are not completely unrelated.'"  *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998) (quoting *Meeks v. Comput. Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)).  Such a relationship is often found where there is a close temporal proximity between the adverse action and the protected activity.  *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).  While there is no clear cutoff for when the temporal relationship becomes too attenuated to support a finding of causation, the general rule is that a period of less than three months between the employee's protected activity and the employer's adverse action is sufficient on its

own to establish prima facie causation. *See, e.g.*, *Robinson v. LaFarge N. Am., Inc.*, 240 F. App'x 824, 829 (11th Cir. 2007) (per curiam) (finding two-month lapse in time sufficiently proximate); *Embry v. Callahan Eye Found. Hosp.*, 147 F. App'x 819, 831 (11th Cir. 2005) (per curiam) (same); *cf. Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) (observing that, in the absence of other evidence of a causal link, three- or four-month lapses in time are not sufficiently proximate to demonstrate causation).

Here, Flynn filed her request to take intermittent leave with Fidelity on August 28, 2013.  (Flynn Dep. Ex. 37).  On November 12, 2013—two months and fifteen days after she filed her request—Fidelity took its first adverse action against Flynn by moving her to a different position with less pay.  (Flynn Dep. 50:17–51:23).  Then, in late November and early December 2013, Flynn began asking Ms. Dunleavy and Ms. Adair if she could switch from intermittent to continuous leave.  (Flynn Aff. ¶ 15).  On December 13, 2013—within one month of her beginning to request continuous leave—Fidelity issued the Notice of Performance Counseling and warned Flynn that she was subject to termination. (Doc. 31-5).  Finally, Flynn asked Ms. Adair about switching to continuous leave again on January 21 and 22, 2014.  (Dunleavy Aff. Ex. 3).  Less than a week later, Fidelity fired Flynn.  (Doc. 31-6).

The time periods between each of Flynn's protected acts and Fidelity's adverse actions are enough on their own to establish prima facie causation.  Moreover, the Court cannot help but notice that each time Flynn exercised or attempted to exercise a right under the FMLA, the amount of time between Flynn's protected conduct and Fidelity's adverse action shortened.  From two and a half months, to one month, to five days, the

timeline of events in this case produces the inescapable inference that Fidelity's actions against Flynn were necessarily tied to her statutorily protected activities.  Thus, there is sufficient record evidence showing a causal link between Flynn's protected conduct and Fidelity's adverse actions.[4]

In sum, Flynn establishes all three elements of a prima facie case for FMLA retaliation.  The burden consequently shifts to Fidelity to articulate a legitimate, non-retaliatory reason for taking the adverse actions it did against Flynn.

### 2.     Fidelity's Legitimate Reasons and Pretext

Fidelity states that it transferred Flynn to a different position, issued the Notice of Performance Counseling, and ultimately terminated Flynn because she violated several company policies regarding work attire, use of her company email, use of her company laptop, and adherence to an appropriate work schedule, and because the overall quality of Flynn's work did not meet Fidelity's expectations despite Fidelity's previous attempts to correct Flynn's shortcomings.  Flynn therefore bears the ultimate burden of persuading the jury by a preponderance of the evidence that Fidelity's proffered reasons are not the true reasons for its actions, but merely a pretext to illegally retaliate against Flynn.  Fidelity submits that the evidence on summary judgment is insufficient for Flynn to do so.

"To show pretext, a plaintiff must come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a

---

[4]   The Court briefly notes that Fidelity also contends Flynn fails to establish causation because Fidelity never knew Flynn was seeking continuous FMLA leave.  It is true that there can be no causal connection where the employer has no knowledge of the employee's protected activity.  *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).  But, for the reasons discussed earlier relating to the protected activity element of Flynn's prima facie case, Fidelity knew of Flynn's attempts to exercise her rights under the FMLA vis-à-vis continuous leave.

reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)) (internal quotation marks omitted). In other words, the employee must adduce evidence which exposes "such weaknesses, implausibilities, inconconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (per curiam) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004)). Evidence relevant to demonstrating pretext might include (1) the temporal proximity between the employee's protected activities and the employer's adverse actions, (2) the employer's shifting or inconsistent explanations for taking action against the employee, and (3) the employer's deviation from its own policies and procedures regarding employee discipline. *See id.* at 1298–99.

The Court finds that adequate evidence exists in the record to create a genuine factual dispute as to whether Fidelity's proffered reasons are a pretext for retaliation. As discussed above regarding the causation element of Flynn's prima facie case, the chronology of events in this case is suspicious. To begin, Flynn worked for Fidelity for approximately fifteen years without incident; it was not until Flynn began exercising her FMLA rights that Fidelity disciplined her for the first time in her career. (Flynn Aff. ¶¶ 5, 9, 11, 15). Additionally, each time Flynn engaged in a protected act, Fidelity took adverse action against her within a short period of time. And each subsequent time Flynn engaged in a protected act, Fidelity's adverse action came quicker—from two and a half months,

to one month, to five days.  This timeline alone could cause a reasonable jury to conclude that Fidelity's actions against Flynn were due to her protected conduct rather than for the reasons Fidelity now asserts.

Ms. Dunleavy's deposition testimony further undercuts Fidelity's proffered reasons for taking action against Flynn.  Ms. Dunleavy testified that Flynn's performance at work had been poor for almost two years before she started taking intermittent leave. (Dunleavy Dep. 97:3–23).  However, Ms. Dunleavy confirmed that it was only when Flynn started taking FMLA leave that Fidelity took action against her.  (*Id.*).  Indeed, there is no evidence in the record indicating that Flynn was ever disciplined for poor work performance—or for any other reason—until she started taking intermittent FMLA leave. Moreover, many of the reasons Fidelity now cites as justification for its actions against Flynn are prohibited by Fidelity's official employee handbook, which cautions that a violation of Fidelity's policies is subject to disciplinary action up to and including immediate termination.  (Flynn Dep. Ex. 6).  Notwithstanding, it appears from the record that Fidelity did not enforce its employment policies against Flynn until she started asserting her FMLA rights.  A reasonable jury could conclude that Fidelity's decision to address Flynn's work performance—which allegedly had been poor for years—only once she started exercising her rights under the FMLA contradicts Fidelity's proffered reasons and reveals its true intent.

Finally, there is evidence in the record suggesting that Fidelity's issuance of the December 13, 2013 Notice of Performance Counseling was merely a set-up to later substantiate Flynn's termination decision.  While the Notice of Performance Counseling identified several areas where Flynn was violating company policy or performing below

expectations and warned that she was subject to termination should her work performance not improve, Fidelity also promised to conduct a follow-up review with Flynn on January 3, 2014. (Doc. 31-5). However, that follow-up review never occurred, (Flynn Aff. ¶ 15), and the only evidence in the record speaking to Flynn's work performance following the Notice of Performance Counseling is Fidelity's January 27, 2014 termination paperwork, (Doc. 31-6). From this, a reasonable jury could glean that Fidelity never actually cared about Flynn's work performance, but used the Notice of Performance Counseling as a ruse to conceal a retaliatory motive.

The Court finds that the above-described evidence is sufficient to convince a rational jury that Fidelity's proffered reasons for taking action against Flynn were not its true reasons, but merely a pretext to retaliate against Flynn for conduct protected by the FMLA. Fidelity is therefore not entitled to summary judgment on Flynn's retaliation claim

### B.   Interference Claim

Flynn also asserts that Fidelity interfered with her exercise of FMLA rights when Fidelity terminated her. To prevail on an FMLA interference claim, an employee must prove two elements: (1) she was entitled to exercise a right or receive a benefit granted by the FMLA, and (2) her employer denied her that right or benefit. *Bartels*, 2017 WL 894452, at *5. It is not necessary for the employee to show that her employer intended to deny her the right or benefit at issue; all that is required to impose liability is for the employee to show that the employer did, in fact, deny her the right or benefit. *Id.* However, the employer can escape liability if it proves that no causal connection exists between its denial and the employee's need for the right or benefit—that is, an employer is not liable where it shows that it would have terminated the employee anyway, without

regard to the employee's need for the right or benefit afforded by the FMLA.  *Id.*; *see also Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010).

Flynn produces sufficient evidence from which a reasonable jury could conclude that Fidelity interfered with her rights under the FMLA.  There is no dispute that Flynn was eligible to exercise intermittent leave due to her own serious health condition, that Fidelity approved Flynn to take such intermittent leave, and that Fidelity terminated Flynn before Flynn had completed her period of intermittent leave.  Rather, Fidelity challenges Flynn's interference claim on two grounds.  First, to the extent Flynn alleges that Fidelity interfered with her attempted use of continuous leave, Fidelity says that Flynn did not provide Fidelity with sufficient notice of her need for continuous leave, thus rendering her ineligible for the benefit.  Second, Fidelity claims that it would have terminated Flynn regardless of her need for either type of FMLA leave due to her poor work performance.

For the reasons explained above with respect to Flynn's retaliation claim, the Court finds both of Fidelity's arguments unavailing.  Flynn's email correspondence with Ms. Dunleavy and Ms. Adair in late November and early December 2013 and on January 21, and 22, 2014, coupled with Fidelity's knowledge that Flynn suffered from a serious health condition covered by the FMLA, provided sufficient information to place Fidelity on notice of Flynn's need for continuous FMLA leave.  And there is sufficient evidence in the record contradicting Fidelity's position that it would have terminated Flynn regardless of her exercise or attempted exercise of FMLA rights.  Accordingly, Fidelity is not entitled to summary judgment on Flynn's interference claim either.

## IV.    CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** that

Defendant Fidelity National Management Services, LLC's Motion for Summary Judgment

(Doc. 23) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on March 28, 2017.

_____
PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record